T.C. Memo. 2002-89

UNITED STATES TAX COURT

RONALD J. LUTZ, JR. AND PAULA M. LUTZ, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10211-99.                    Filed April 4, 2002.

<u>Michele M. Echols</u>, for petitioners.[1]

<u>Emile L. Hebert III</u> and <u>Susan S. Canavello</u>, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>:  Respondent determined a $37,164 deficiency
in petitioners' 1996 joint Federal income tax and a $7,349

_____

[1] At trial, petitioners were represented by <u>Robert L.
Henderson, Jr.</u>, who subsequently withdrew.

accuracy-related penalty under section 6662(a).[2]  The issues for decision are:  (1) Whether petitioners in 1996 had unreported wagering gains in excess of wagering losses, and if so, the amount of the excess gains; and (2) whether petitioners are liable for a penalty under section 6662(a) for substantially understating their 1996 income tax.

## FINDINGS OF FACT

The parties have stipulated some facts, which we incorporate herein by this reference.  When they petitioned the Court, petitioners, husband and wife, resided in Slidell, Louisiana.

During 1996, petitioner husband (Ronald) was president and part owner of Mega International, Inc. (Mega), an S corporation which operated an offshore oil field business.[3]  During 1996, Ronald earned $80,000 in wages from Mega.  During 1996, petitioner wife (Paula) did not work outside the home.  Although Paula was not employed by Mega and otherwise provided no services to Mega, during 1996 she also received $24,000 from Mega, which reported the payments to her on a 1996 Form W-2, Wage and Tax Statement, as wages, tips, or other compensation.

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3] Unaudited financial statements admitted into evidence indicate that petitioners owned 49 percent of Mega International, Inc. (Mega).  The record otherwise contains no information about the ownership of Mega.

In 1996, Ronald's employment with Mega required him to work 60 to 80 hours per week. In June 1996, Paula gave birth to petitioners' third child. Despite the demands of their respective obligations, however, petitioners found time in 1996 for a great deal of recreational gambling. Two or three times a week, they went to casinos together. Once or twice a week, Paula went to casinos without Ronald.

Petitioners gambled primarily at the following four casinos: Casino Magic in Biloxi, Mississippi (Biloxi Casino Magic); Casino Magic in Bay St. Louis, Mississippi (Bay St. Louis Casino Magic); Bayou Caddy's Jubilation Casino in Lakeshore, Mississippi (Jubilation Casino); and Boomtown Casino in Harvey, Louisiana (Boomtown Casino).

When petitioners visited a casino together, they usually gambled in separate areas, until one of them ran out of money and went and found the other. Ronald favored table games; Paula played both table games and slot machines. Sometimes Paula would gamble all day, into the wee hours. During their gambling trips, the casinos furnished petitioners, free of charge, meals, hotel rooms, and such.

When petitioners went to the casinos, they sometimes brought substantial amounts of cash for gambling. Sometimes they obtained cash at the casinos, either through a line of credit with the casinos, or by cashing a check, using a credit card, or

making automatic teller machine withdrawals.  Sometimes they would take cash home from the casinos; sometimes they would not.  Except for the $40,000 proceeds of one jackpot that Paula won in February 1996, petitioners deposited into their checking or savings accounts none of the cash that they brought home from the casinos.

During 1996, petitioners kept no records of their gambling activities.  Biloxi Casino Magic and Bay St. Louis Casino Magic (collectively, the Casinos Magic), however, maintained some records of petitioners' gambling activities.  With regard to petitioners' table games play, these records consist primarily of computer-generated "Trip History Reports" (THRs), wherein the casinos' table games supervisors would estimate and record petitioners' "observed" wins and losses on particular dates.  The THRs indicate that during 1996 petitioners had estimated total winnings and losses at table games in the following amounts:

|  | Winnings | Losses |
| --- | --- | --- |
| Paula: |  |  |
| Bay St. Louis Casino Magic | -- | $32,729 |
| Biloxi Casino Magic | $1,250 | -- |
| Ronald: |  |  |
| Bay St. Louis Casino Magic | 10,850 | 7,500 |
| Biloxi Casino Magic | -- | 350 |

Employees of the Casinos Magic typically do not "observe" patrons' slot machine play, as they do table games play.  The casinos do, however, make available to their patrons so-called

Player's Club cards--magnetic-strip cards that when inserted into the casinos' slot machines electronically track the player's wins and losses. During 1996, Paula had several Player's Club cards, but she did not use them because she thought they were a "jinx". As far as the record reveals, Ronald also used no Player's Club card when he gambled at slot machines. Consequently, the only Casinos Magic records of petitioners' slot machine play are those that relate to the casinos' reporting, on Form W-2G, Certain Gambling Winnings, of slot machine winnings over $1,200.[4]

In 1996, the Bay St. Louis Casino Magic issued 24 Forms W-2G to Paula and one Form W-2G to Ronald, reporting aggregate slot machine winnings in 1996 of $99,500 ($98,250 for Paula and $1,250 for Ronald) on total bets placed of $4,975--reflecting a 20-to-1 payoff on each individual jackpot. In 1996, the Biloxi Casino Magic issued 10 Forms W-2G to Paula and one Form W-2G to Ronald, showing aggregate winnings of $39,400 ($37,800 for Paula and $1,600 for Ronald).[5]

During 1996, petitioners also had these other gambling winnings and losses:

---

[4] Forms W-2G, Certain Gambling Winnings, are required to be issued for table game winnings of $600 or more and for slot machine winnings of $1,200 or more. Sec. 6041(a); sec. 7.6041-1, Temporary Income Tax Regs., 42 Fed. Reg. 33286 (June 30, 1977).

[5] The record does not indicate the amounts of bets placed with respect to these Biloxi Casino Magic winnings.

|                   | Winnings | Losses |
|-------------------|----------|--------|
| Boomtown Casino   | $2,645   | $1,690 |
| Jubilation Casino | 3,100    | 1,550  |

On their 1996 joint Federal income tax return, petitioners reported no income or losses from their gambling activities. They reported $104,000 wage income from Mega.

Respondent commenced an examination of petitioners' 1996 joint Federal income tax return in December 1998. In the notice of deficiency, issued in March 1999, respondent determined that petitioners had $91,000 unreported gambling income. Respondent's determination was based on gambling winnings reported on 18 Forms W-2G--two from Jubilation Casino (showing $3,100 total gross winnings), eight from the Bay St. Louis Casino Magic (showing $61,000 total gross winnings), seven from the Biloxi Casino Magic (showing $24,900 total gross winnings), and one from Boomtown Casino (showing $2,000 total gross winnings).

## OPINION

Petitioners contend that their 1996 gambling losses more than offset their gambling winnings and that respondent's determination is therefore in error. Respondent concedes that petitioners had $43,818.75 of gambling losses in 1996, based largely on the THRs generated by the Casinos Magic with respect to petitioners' table games play. Respondent contends, however, that petitioners had at least $144,645 of unreported gambling winnings in 1996, and that the notice of deficiency reflects only

$91,000 of these unreported gambling winnings, thus omitting (for unexplained reasons) at least $53,645 of these unreported gambling winnings. Respondent contends that since the $43,818.75 conceded gambling losses are less than the unreported gross gambling winnings that were omitted from the notice of deficiency, petitioners are entitled to no deduction for gambling losses.[6]

Gross income includes all income from whatever source derived, including gambling. Sec. 61; McClanahan v. United States, 292 F.2d 630, 631-632 (5th Cir. 1961). In the case of a taxpayer not engaged in the trade or business of gambling, gambling losses are allowable as an itemized deduction, but only to the extent of gains from such transactions. See sec. 165(d); McClanahan v. United States, supra; Winkler v. United States, 230 F.2d 766 (1st Cir. 1956); Gajewski v. Commissioner, 84 T.C. 980 (1985).

Absent a statutory exception, petitioners generally bear the burden of proving their entitlement to claimed deductions. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). When respondent raises a new matter, however, the burden of proof is on him. Rule 142(a). Accordingly, respondent bears the burden of establishing the amount of petitioners' additional unreported

---

[6] Respondent does not seek any increased deficiency based on gambling winnings omitted from the notice of deficiency.

gross gambling income that is not reflected in the notice of deficiency. See Kalisch v. Commissioner, T.C. Memo. 1986-541, affd. without published opinion 838 F.2d 461 (3d Cir. 1987).

In certain circumstances, section 7491 places the burden of proof on respondent with regard to certain factual issues. Section 7491 is effective with respect to court proceedings arising in connection with examinations commencing after July 22, 1998. Internal Revenue Service Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3001(c)(2), 112 Stat. 727. The examination in the instant case began in December 1998. Therefore we evaluate whether respondent bears the burden of proof pursuant to section 7491.

Section 7491(a)(1) provides that if, in any court proceeding, the taxpayer introduces credible evidence with respect to factual issues relevant to ascertaining the taxpayer's liability for a tax (under subtitle A or B), the burden of proof with respect to such factual issues will be placed on the Commissioner, provided that various conditions are met. One of the conditions is that the taxpayer must comply with the substantiation and record-keeping requirements of the Internal Revenue Code. See sec. 7491(a)(2)(A) and (B).[7] Under the

---

[7] For the burden to be placed on the Commissioner, the taxpayer must also cooperate with reasonable requests by the Commissioner for "witnesses, information, documents, meetings, and interviews". Sec. 7491(a)(2)(B). Respondent argues that

(continued...)

Internal Revenue Code, the taxpayer is required to maintain records that are sufficient to enable the Commissioner to determine the correct tax liability. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.; see also Rev. Proc. 77-29, 1977-2 C.B. 538 (providing guidance as to acceptable evidence for substantiating wagering wins and losses). Here, petitioners do not dispute that they failed to maintain records of their gambling activities. Accordingly, the burden of proof as to petitioners' gambling losses is not placed on respondent, and petitioners bear the burden of substantiating the amount of any claimed gambling loss deduction. See Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. 540 F.2d 821 (5th Cir. 1976).

Moreover, as discussed in greater detail below, although petitioners have introduced evidence substantiating some losses-- and respondent has conceded some losses--petitioners have failed to introduce credible evidence, as required by section 7491(a),

---

[7](...continued)
petitioners fail this requirement, having failed to produce any documents to substantiate their gambling winnings and losses after receiving from respondent a December 1998 letter regarding the examination of their 1996 Federal tax liabilities. Because we conclude that petitioners have failed the substantiation and record-keeping requirements of sec. 7491(a)(2)(A) and (B), we need not decide whether petitioners also fail the cooperation test.

The benefits of sec. 7491 are also unavailable if the taxpayer fails certain net-worth limitations. See sec. 7491(a)(2)(C). Respondent does not argue that petitioners fail the net-worth limitations.

to show that their gambling losses equal or exceed their gambling winnings.[8]

In contending that petitioners had at least $144,645 of unreported gambling winnings, respondent relies on stipulations and undisputed evidence which show that petitioners had unreported gambling winnings from the following sources:

| | |
|---|---|
| Boomtown Casino | $2,645 |
| Jubilation Casino | 3,100 |
| Bay St. Louis Casino Magic | 99,500 |
| Biloxi Casino Magic | 39,400 |
| Total | 144,645 |

While we agree (and petitioners do not dispute) that petitioners had unreported gambling winnings of $144,645, respondent has not shown that the entire $144,645 represents gross income to petitioners. The evidence shows, and we have found, that the $99,500 gambling winnings from the Bay St. Louis Casino Magic, as reported on Forms W-2G, were all from slot machine play and that to win this $99,500, petitioners placed bets of $4,975. Therefore, $4,975 of the $99,500 slot machine winnings is in the nature of a recovery of capital and should be excluded from petitioners' gross gambling winnings to arrive at

---

[8] Sec. 7491 does not define what constitutes credible evidence. The pertinent legislative history states: "Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." H. Conf. Rept. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995; see Higbee v. Commissioner, 116 T.C. 438, 442 (2001).

gross income under section 61 and adjusted gross income under section 62. See Hochman v. Commissioner, T.C. Memo. 1986-24.

Similarly, the $39,400 gambling winnings from the Biloxi Casino Magic is the amount reported as gambling winnings on Forms W-2G. The record does not expressly indicate whether these gross winnings are from slot machine or table games play. On the basis of all the evidence in the record, however, we infer that the $39,400 winnings are all from petitioners' slot machine play at the Biloxi Casino Magic.[9] Although the evidence does not expressly indicate the amounts of bets that petitioners placed to win these jackpots, we believe that it is a fair inference that the slot machine payoffs for the Bay St. Louis Casino Magic and the Biloxi Casino Magic were the same; i.e., 20 to 1. Accordingly, we infer that petitioners placed aggregate bets of $1,970 to win the $39,400 at the Biloxi Casino Magic.[10]

---

[9] This inference is based on several considerations: According to the Biloxi Casino Magic Trip History Reports (THRs) that are in evidence, petitioners had only $1,250 table games winnings at the Biloxi Casino Magic. The smallest amount of winnings shown on the Biloxi Casino Magic Forms W-2G, however, is $1,600. All of petitioners' winnings as reported on the Forms W-2G from the Biloxi Casino Magic are in amounts greater than $1,200--the slot machine threshold amount--and are in round numbers, in amounts similar to those reflected on the Bay St. Louis Casino Magic Forms W-2G. Since the latter Forms W-2G clearly relate solely to slot machine play, we infer that the Biloxi Casino Magic Forms W-2G also relate solely to slot machine play.

[10] By contrast, with respect to petitioners' winnings of $2,645 and $3,100 from Boomtown Casino in Harvey, La., and
(continued...)

Consequently, petitioners' cost of winning the $138,900 total slot machine winnings was $6,945 ($4,975 plus $1,970). Subtracting this amount from petitioners' $144,645 gross gambling winnings (which includes the $138,900 slot machine winnings), we conclude that the facts relied upon by respondent show that petitioners had total unreported gross income from gambling of $137,700.[11]

As previously discussed, respondent determined in the notice of deficiency that petitioners had unreported gambling winnings of $91,000, of which amount $85,900 represent slot machine winnings reported on Forms W-2G from the Casinos Magic. Consistent with our conclusion that these slot machine winnings reflect payoffs of 20 times the bets placed, it appears that petitioners' cost of winning the $85,900 total jackpots was $4,295. Excluding this capital-recovery cost from the gross gambling winnings reflected in the notice of deficiency, we

---

[10](...continued)
Jubilation Casino in Lakeshore, Miss., respectively, the record contains no basis for inferring either the type of games played or the bets placed.

[11] This figure does not include table games winnings reflected on the Casinos Magic THRs, in amounts of $10,850 for Ronald and $1,250 for Paula. Nor does this figure otherwise include any of petitioners' gross gambling winnings that might have been under the casinos' reporting thresholds. Respondent has not expressly argued that any such additional unreported winnings should be taken into account. Accordingly, we give them no further consideration in assessing petitioners' allowable gambling losses.

- 13 -

conclude that the unreported gross income indicated by the notice of deficiency is $86,705 ($91,000 less $4,295).

To recap, we conclude that the facts relied upon by respondent show that petitioners had unreported gambling gross income of $137,700. This amount is $50,995 greater than the $86,705 unreported gambling gross income indicated by the unreported gross gambling winnings reflected in the notice of deficiency. To establish their entitlement to deduct gambling losses from the gross gambling income indicated by the notice of deficiency, petitioners must establish that their gambling losses are greater than the $50,995 of unreported gross gambling income that is not reflected in the notice of deficiency. See Schooler v. Commissioner, 68 T.C. 867 (1977). Respondent has conceded that petitioners have gambling losses of $43,818.75, based largely on the THRs generated by the Casinos Magic with respect to petitioners' table games play. Accordingly, petitioners must establish additional gambling losses of at least $7,176.25 ($50,995 less $43,818.75) to show entitlement to any gambling loss deduction.[12]

---

[12] As discussed in more detail in the text, the $43,818.75 gambling losses that respondent has conceded represent primarily losses reflected in THRs, relating to table games play at the Casinos Magic. These conceded losses do not include petitioners' costs of placing slot machine bets and hence do not duplicate the amounts that we have concluded should be allowed as an offset in determining petitioners' gross income from slot machine winnings.

As previously discussed, the notice of deficiency is based on respondent's determination that petitioners had unreported slot machine winnings from the Casinos Magic and a lesser amount of winnings from the Boomtown Casino and the Jubilation Casino. The parties have stipulated the amount of gambling losses that petitioners sustained at Boomtown Casino and Jubilation casino. Respondent has conceded the Casinos Magic table games losses as reflected on the THRs. Accordingly, the essence of the dispute between the parties is whether petitioners have substantiated gambling losses with respect to their slot machine play at the Casinos Magic.

Having kept no records of losses on their slot machine play at the Casinos Magic, petitioners rely on two undated letters, on Bay St. Louis Casino Magic letterhead and signed by Tina Frederiksen in her capacity as "Casino Magic VIP Representative". These letters state that for 1996 Paula had a net loss of $20,910 and Ronald had a net win of $3,350 "in Table Games, Slots, or combined play". The letters contain a number of caveats, however, including that the casino's tracking system "is designed for marketing purposes only", that the "information should only be used to support your personal records", that the casino "cannot be certain that you used your * * * Player's Club Card every time you visited us, or used it correctly", and that "Table Game play is not an exact account of actual play; it is strictly

an estimate." Although Ms. Frederiksen (using her married name of Cantrell) testified at trial, she offered no testimony regarding the source or nature of the information contained in the two letters.

From the face of the letters, we infer that estimates therein of petitioners' net winnings and losses are based on the casinos' tracking system. The evidence shows that the casinos generally did not track slot machine wins and losses unless the patron used a Players' Club card. Paula testified that she did not use her Players' Club cards when she played slot machines because she thought they were a "jinx." Similarly, there is no evidence that Ronald ever used a Players' Club Card when he played slot machines. Accordingly, we conclude that the letters are unreliable indicators of petitioners' gambling winnings and losses, failing in particular to reflect either slot machine winnings or losses. Cf. <u>Mayer v. Commissioner</u>, T.C. Memo. 2000-295 (similar unsigned letter from Caesar's Palace, purporting to estimate the taxpayer's gambling winnings and losses, was deemed to be unreliable evidence and given no weight), affd. 2002 U.S. App. LEXIS 2838 (2d Cir. 2002).

Petitioners contend that their bank statements and other documentary evidence show that during 1996 they made cash withdrawals or debit or credit card charges at the casinos totaling some $39,329. Assuming that petitioners made such

transactions at the casinos, the mere fact of these transactions does not substantiate actual losses of those funds on gambling. See Schooler v. Commissioner, 68 T.C. at 870; Klabacka v. Commissioner, T.C. Memo. 1987-77.

Petitioners presented testimony of casino employees, indicating that the odds of beating the casinos over the long haul are not good. We do not doubt it. Such generalizations, however, do not tend to substantiate petitioners' actual gambling losses or provide us any basis for estimating them.

Petitioners rely upon Doffin v. Commissioner, T.C. Memo. 1991-114, to establish that they are entitled to deduct gambling losses. In Doffin, the taxpayer had $46,240 lottery winnings in one year and $32,571 in another. The taxpayer kept no records of gambling losses. The Commissioner allowed the taxpayer a deduction for gambling losses limited to the costs of the winning lottery tickets ($494) in one of the years at issue. The Commissioner allowed the taxpayer no gambling losses for the other year. The evidence in Doffin showed that the taxpayer, who lived in a mobile home and had few assets and little income, had sold assets and borrowed money during the years at issue to support his gambling habit. The taxpayer's lifestyle and financial position indicated no accessions to wealth commensurate with the amount of net gambling winnings determined by respondent. Finding it highly improbable that the taxpayer would

have purchased only winning tickets, the Court applied the rule of <u>Cohan v. Commissioner</u>, 39 F.2d 540 (2d Cir. 1930), to estimate the amount of the taxpayer's gambling losses.

Unlike <u>Doffin v. Commissioner</u>, <u>supra</u>, this is not a case where the taxpayers had few assets, no income apart from gambling, and no significant accessions to wealth during the year at issue. Petitioners have admitted to an increase in their net worth for 1996 that corresponds roughly to the amount of unreported gambling income that respondent has determined. Petitioners introduced into evidence unaudited statements of financial position, purporting to show the change in their net worth during 1996. These documents indicate that during 1996 petitioners' net worth increased by $89,503 (from $542,275 to $631,778). These documents indicate that during 1996 petitioners purchased, among other things, a new Chevrolet Suburban and a motorcycle, and that the value of their interest in Mega increased by some $70,000 during 1996.[13] In short, we are unable to conclude on the basis of the evidence in the record that petitioners' significant accessions to wealth in 1996 were not

---

[13] Although petitioners testified that they did not put any gambling winnings into Mega, we note that in 1996 Mega paid Laura $24,000, even though she performed no services for Mega. In this regard, Paula testified that Mega "paid my husband and I, since we owned the company * * * they wrote us a check. But I didn't do anything." These peculiar circumstances raise the suggestion, if not the likelihood, that Mega's assets and petitioners' separate assets were to some degree fungible.

attributable in whole or part to their unreported gambling winnings.

Petitioners' testimony on this score was less than compelling. On direct examination, Paula was asked the leading question whether "you feel like your [1996] losses exceeded your winnings". In response, Paula testified, "I think so. I don't have--we didn't have any money. * * * I mean, it just--I mean, nothing really changed. We had money in and out, in and out of-- it was like we had gambling money all year. It would go through our fingers." Surely every taxpayer can attest that income has a way of slipping through the fingers and leaving one feeling none the richer for it. This dolorous fact of life, however, affords no basis for tax relief in the ordinary situation, much less in the situation here involving unreported gambling winnings.

In sum, we are unconvinced that petitioners' gambling losses exceeded the unreported gross gambling income not reflected in the notice of deficiency. The record provides no satisfactory basis for estimating petitioners' gambling losses in excess of the amount we have allowed as a downward adjustment and the amount conceded by respondent. Consequently, we do not apply the rule of Cohan v. Commissioner, supra, to estimate the amount of losses. See Donovan v. Commissioner, 359 F.2d 64 (1st Cir. 1966), affg. T.C. Memo. 1965-247; Stein v. Commissioner, 322 F.2d 78, 83 (5th Cir. 1963), affg. T.C. Memo. 1962-19; Schooler v.

Commissioner, supra; Mayer v. Commissioner, supra (disallowing unsubstantiated slot machine losses). Petitioners could have avoided this result by keeping records of their gambling activities or perhaps by simply using their Players' Club cards to track their slot machine play at the Casinos Magic. Instead, they spun the wheel with the tax laws and therein made a losing wager.

Accordingly, we allow petitioners no gambling losses for 1996, although, as previously discussed, we adjust downward (from $91,000 to $86,705) respondent's determination of petitioners' unreported gross income from gambling, to account for petitioners' cost of making the winning slot machine bets at the Casinos Magic.

## Accuracy-Related Penalty

Respondent determined that petitioners are liable for an accuracy-related penalty under section 6662(a) for a substantial understatement of tax. Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of any underpayment that is attributable to a substantial understatement of income tax. Section 6662(d)(1) defines a "substantial understatement" of income tax as one which exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. The accuracy-related penalty does not apply with respect to any portion of the

underpayment if it is shown that the taxpayer had reasonable cause and acted in good faith. Sec. 6664(c).

Because this court proceeding arises in connection with an examination commenced after July 22, 1998, respondent bears the burden of producing sufficient evidence to support imposition of the accuracy-related penalty; however, the burden remains on petitioners to show that the reasonable cause exception applies. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001); Penn v. Commissioner, T.C. Memo. 2001-267.

As previously discussed, the undisputed evidence shows that petitioners had at least $86,705 in unreported gross income from gambling, as determined by reference to the $91,000 of gambling winnings as understated in the notice of deficiency. Petitioners have failed to substantiate gambling losses in excess of unreported gambling gross income omitted from the notice of deficiency. The net result is a substantial understatement of tax as defined in section 6662(d)(1)(A).

In determining whether a taxpayer acted with reasonable cause and in good faith, the most important factor is the extent of the taxpayer's effort to assess the proper tax liability. Sec. 1.6664-4(b)(1), Income Tax Regs. With respect to petitioners' 1996 gambling activities, four casinos issued petitioners some 39 Forms W-2G, reporting aggregate gambling winnings over $144,000--an amount greater than petitioners'

substantial wage income.  Yet petitioners reported neither gambling winnings nor gambling losses on their Federal income tax return, nor did they disclose this omission on their return.

On brief, petitioners argue that they are not liable for the accuracy-related penalty because they believed their gambling losses exceeded their gambling winnings and "in good faith with reasonable cause under a wrong assumption did not report the gambling winnings."  It is well settled that taxpayers have a duty to report as gross income gambling winnings such as those involved here; gambling losses must be claimed as itemized deductions, subject to statutory limitations.  See McClanahan v. United States, 292 F.2d at 631-632; Gajewski v. Commissioner, 84 T.C. at 982; Johnston v. Commissioner, 25 T.C. 106, 108 (1955).  Taxpayers are required to take reasonable steps to determine the law and comply with it.  Niedringhaus v. Commissioner, 99 T.C. 202, 222 (1992).  The record does not indicate that petitioners took any such steps or that any portion of their underpayment was due to reasonable cause.

Accordingly, we conclude that petitioners are liable for an accuracy-related penalty under section 6662(a).

To reflect the foregoing,

Decision will be entered

under Rule 155.