T.C. Memo. 2020-146

UNITED STATES TAX COURT

JOHN M. COLEMAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19540-17.                                  Filed October 22, 2020.

<u>John B. Magee</u> and <u>Eric J. Albers-Fiedler</u>, for petitioner.

<u>William J. Gregg</u>, <u>Bartholomew Cirenza</u>, and <u>Ryan Z. Sarazin</u>, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  Because petitioner did not file a Federal income tax re-

turn for 2014, the IRS prepared a substitute for return (SFR) and issued him a no-

tice of deficiency.  The parties have settled all issues but two:  (1) whether peti-

tioner has substantiated gambling losses in excess of $350,241, the amount of his

**[*2]** gambling winnings as reported to the IRS and (2) whether petitioner is entitled to a deduction on Schedule C, Profit or Loss From Business, for the purchase of a laptop computer. We find on the basis of his financial records, trial testimony, and an expert witness report that petitioner has substantiated gambling losses in excess of his gambling winnings. But we find that he has not met the heightened substantiation requirements of section 274(d) for deducting the cost of his computer.[1]

FINDINGS OF FACT

We draw the following facts from three joint stipulations, the exhibits attached thereto, and the exhibits and testimony presented at trial. Petitioner resided in Maryland when he filed his petition.

A. Petitioner's History of Gambling

At the time of trial petitioner was 71 years old. A licensed insurance agent, he worked for the District of Columbia Department of Insurance, Securities, and Banking (DISB) for 28 years before retiring in 2004. Upon retiring he started an insurance consulting business that generated a modest amount of income during

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all dollar amounts to the nearest dollar.

[*3] 2014.  His wife, to whom he has been married for 47 years, earned wage income in 2014 and is not a party to this case.

Petitioner is a compulsive gambler.  He started gambling on card games in high school.  During the 1980s he began playing commercial slot machines in Atlantic City, New Jersey.  As more casinos opened closer to his home in Maryland, he gambled at those locations and did so more frequently.  The frequency of his gambling increased further after he retired from DISB in 2004.

Petitioner acknowledges that he is a compulsive gambler and that his gambling has adversely affected his financial circumstances and his family life.  Despite receiving substantial income over the years, petitioner has been delinquent in paying property taxes on the family home, which was exposed to the risk of tax sales in 2014 and other years.  His cell phone service has been disconnected for failure to pay.  He has received numerous final notices threatening to cut off household utility services.  With the help of the attorneys representing him in this case, petitioner has been receiving treatment for his gambling disorder since March 2019.  He still gambles occasionally, but much less frequently than he did in 2014.

**[*4]** B.     Petitioner's Gambling Transactions During 2014

The parties have stipulated the amounts of petitioner's income and deductions for 2014, apart from the two items that remain in dispute. During 2014 petitioner received taxable nongambling income of $76,784 and a nontaxable personal injury insurance settlement of $150,000. He also received $350,241 of gambling winnings, reported to him on 160 separate Forms W-2G, Certain Gambling Winnings, by the casinos at which he gambled.

During 2014 petitioner gambled at four casinos: Maryland Live! (ML), Rod 'N' Reel Resort (RNR), Dover Downs (DD), and Horseshoe Casino Baltimore (Horseshoe). He kept a diary that tracked some of his wins and losses, but it was not submitted into evidence. None of the four casinos kept complete records of his gambling transactions.

Casinos are required to issue Forms W-2G reporting slot machine jackpots of $1,200 or more. See sec. 7.6041-1, Temporary Income Tax Regs., 42 Fed. Reg. 33286 (June 30, 1977); Rev. Proc. 77-29, 1977-2 C.B. 538. All four casinos kept records of every instance in which petitioner won a prize of $1,200 or more. When that happened, the machine petitioner was using would lock and an attendant would collect petitioner's information before bringing him his prize and reset-

[*5] ting the machine. Casinos are not required to keep track of gambling losses or smaller winnings.

Besides recording prizes of $1,200 or more, DD and Horseshoe tracked petitioner's wins and losses when he signed into slot machines using casino-issued rewards cards (sometimes called players cards). Petitioner used these cards fairly often, but he did not always use them, either because he forgot or because he believed that temporarily not using the cards might help change his luck. Combining petitioner's prizes of $1,200 or more and his wins and losses when he used his rewards card, DD's incomplete records show net gambling winnings of $52,804 during 2014. Horseshoe's incomplete records, calculated the same way, show net gambling winnings of $1,501. The other two casinos did not keep records based on rewards card data.

Petitioner gambled on at least 193 days during 2014, most likely more. Drawing on the $150,000 insurance settlement he received in 2014, petitioner gambled more that year than he had been able to in other years because he had more money available to him. He was regularly away from home gambling for 8- to 10-hour periods, at all times of day and night. He sometimes visited more than one casino in a single day, either in an attempt to change his luck or because he had exhausted his cash advance privileges at his first destination. He sometimes

[*6] stayed overnight at a casino so its weekly limit on cash advances would reset, enabling him to do more gambling the next day. On many occasions the casino provided him with a free hotel room as a reward for his patronage.

Petitioner gambled almost exclusively on slot machines. At ML he normally bet $10 per spin but would sometimes bet as much as $100 per spin. At DD his average bet was $18, but on at least one occasion he gambled in the high rollers section and bet up to $100 per spin. At RNR he normally bet $5 but would sometimes bet up to $20 per spin. Horseshoe did not open until August 2014 and he played there less regularly. Like many frequent gamblers, petitioner gambled quickly and methodically. Without accounting for breaks, he would often spin the machine (actually, push a button) at least ten times per minute.

If petitioner did not have prize winnings left over from his last gambling excursion--and he usually did not--he would stop to withdraw cash on the way to the casino. He typically made such withdrawals, in amounts often ranging between $2,000 and $3,000, from his account at Industrial Bank. He rarely started any day of gambling with less than $1,000.

Petitioner had two credit cards and two credit union accounts. If he ran out of money while gambling, he would withdraw money from an onsite ATM, secure an advance on a debit or credit card, or get a cash advance from the casino (to be

[*7] repaid from his credit union accounts at a later date). He would sometimes go in search of additional money for gambling several times a day. During 2014 he made 210 withdrawals from his credit card and credit union accounts while gambling at casinos. These withdrawals, totaling $240,113, are summarized as follows:

| Location | Withdrawals | Amount |
|---|---|---|
| ML | 101 | $114,717 |
| DD | 30 | 49,676 |
| RNR | 79 | 75,720 |
| Total | 210 | 240,113 |

The parties have stipulated that petitioner used the cash withdrawn on the premises of these three casinos, less transaction fees of $2,504, for gambling.

C.     Petitioner's Assets and Net Worth

Petitioner's financial accounts do not reveal any increase in net worth that could be traced to net gambling winnings. At the credit union his share draft account for 2014 had a beginning balance of $1,344 and an ending balance of $125, and his regular account had a beginning balance of $21 and an ending balance of $483. At year-end 2014 one of his credit cards had a closing statement balance due of $14,158, and the other had a closing statement balance due of $14,085.

**[\*8]**  Petitioner's account at Industrial Bank had a balance of $233 at the beginning of 2014.  On March 14, 2014, he deposited his $150,000 insurance settlement into that account.  He drew down that balance during the rest of the year, chiefly by withdrawing funds to use at casinos.  He made no deposits into his Industrial Bank account other than the insurance settlement, and the balance of that account was reduced to $8,598 at year-end 2014.

When petitioner retired from DISB in 2004, he had approximately $75,000 in a retirement plan account.  He took numerous distributions from that account during the ensuing 10 years, chiefly to fund his gambling habit, and by year-end 2014 only $2,725 remained.  Petitioner had no other retirement accounts, brokerage accounts, certificates of deposit, checking accounts, or investment assets.  He made no significant changes to his lifestyle during 2014, took no vacations, made no large gifts, and purchased no real estate, jewelry, or other expensive personal property.  His wife had separate bank accounts, and there is no evidence that any of his gambling winnings were deposited into her accounts.[2]

---

[2]Petitioner's wife had $59,919 in nonrecurring deposits appearing on her 2014 bank statements, and she was able to identify the specific source of most of those deposits.

**[*9]** D.     IRS Examination

Neither petitioner nor his wife filed a timely return for 2014, and neither made any estimated tax payments. The IRS prepared an SFR for each of them, see sec. 6020(b), and issued petitioner a notice of deficiency on the basis of his SFR. The notice determined a deficiency of $128,886 and additions to tax totaling $46,025 for failure to timely file, failure to timely pay, and failure to pay estimated tax. See secs. 6651(a)(1) and (2), 6654.

The deficiency was largely attributable to $350,241 in unreported gambling winnings, the total reported to the IRS by the casinos on Forms W-2G. On the basis of other third-party reporting the IRS determined additional unreported income of approximately $40,000, consisting chiefly of retirement income.

Petitioner timely petitioned this Court for redetermination. After securing representation from pro bono counsel, petitioner attempted to file a Form 1040, U.S. Individual Income Tax Return, on which he reported his gross income for 2014 and the deductions to which he believed he was entitled. The IRS did not accept that return, but before trial the parties stipulated the correctness of all items on the pro forma 2014 return except two: a $350,241 deduction claimed for gambling losses and a $402 deduction claimed for a laptop computer allegedly purchased for use in his Schedule C consulting business. Petitioner does not con-

**[\*10]** test the additions to tax under section 6651(a)(1) or (2) or 6654, so they will apply to the extent a deficiency remains for 2014.

E.    Trial

We tried the case in February 2020 in Washington, D.C.  At trial the Court heard testimony from petitioner, his wife, and the adult daughter who lives with them.  The Court also heard testimony from Mark C. Nicely, whom we recognized as an expert in mathematics, the casino gaming industry, and casino gaming equipment, particularly slot machines.

Mr. Nicely has a bachelor's degree from Rensselear Polytechnic Institute, where he concentrated in electrical, computer, and systems engineering.  He has taken postgraduate classes at Stanford University and the University of California (Berkeley) in software, software technology, and mathematics (including statistics, probability, and financial analysis).  Before working in casino gaming, Mr. Nicely had more than ten years' experience as a computer software engineer specializing in algorithm development.  At the time of trial Mr. Nicely had worked in the gaming industry for 20 years.  He has been recognized as an expert witness in more than a dozen litigated cases involving gambling.  In Gagliardi v. Commissioner, T.C. Memo. 2008-10, 95 T.C.M. (CCH) 1044, 1052 (2008), we recognized Mr.

**[*11]** Nicely as a gaming industry expert with expertise in mathematics and slot machines.

Using established statistical techniques, Mr. Nicely estimated the likely outcome of petitioner's gaming transactions during 2014 on the basis of the frequency with which petitioner gambled and the expected win percentages at the casinos where he gambled. Mr. Nicely concluded, with a 99% level of certainty, that petitioner had overall net gambling losses of at least $151,690 during 2014. Mr. Nicely based these conclusions on interviews with petitioner, documents in the record, his gaming industry experience, publicly available information about the casinos' payout percentages, and statistical analysis.

Mr. Nicely explained that, if a player gambles long enough and does not win any prizes that are exceptionally large relative to the size of the wager, it would be virtually impossible for that player to have annual net gambling winnings. The Maryland and Delaware casinos at which petitioner gambled configured their slot machines so that the average "return to player" percentages ranged from 87% to 95%. By statute the average "return to player" percentage could not exceed 95% without written permission from each State lottery. See Del. Code Ann. tit. 29, sec. 4805(a)(15) (West 2014); Md. Code Ann., State Gov't sec. 9-1A-22(b) (West 2014); Md. Code Regs. 36.04.01.11.E (2014). Mr. Nicely opined that the odds

[*12] against petitioner's having enjoyed even $1 of net gambling profit, for the entirety of 2014, were at least 140 million to 1.

As for the business expense deduction, petitioner supplied a receipt from Drop & Fix Computer dated March 6, 2014. The receipt was issued to "Ms. Coleman" for a refurbished "Dell 1545 laptop w/charger" and a wireless mouse. Petitioner testified that his wife bought this computer for him with money he gave her because she had used this vendor before and the store was on her way to work.

OPINION

A.    Legal Framework for Gambling Income and Deductions

Gross income includes all income from whatever source derived, including gambling winnings. Sec. 61(a); Bauman v. Commissioner, T.C. Memo. 1993-112, 65 T.C.M. (CCH) 2165, 2166 (1993). For a taxpayer who does not engage in gambling as a trade or business, losses from wagering transactions are allowable as an itemized deduction, but "only to the extent of the gains from such transactions." Sec. 165(d).[3]

---

[3]Taxpayers engaged in the trade or business of gambling may deduct their gambling losses against their gambling winnings as a business expense in arriving at adjusted gross income. See sec. 62(a)(1). Petitioner does not claim to be in the trade or business of gambling, and the record does not suggest otherwise.

**[\*13]** Deductions are a matter of legislative grace, and taxpayers must prove entitlement to all deductions claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Taxpayers are required to identify each deduction, show that they have met all relevant requirements, and keep books or records to substantiate their expenses. See sec. 6001; Roberts v. Commissioner, 62 T.C. 834, 836-837 (1974); sec. 1.6001-1(a), Income Tax Regs.

In practice, not all gamblers keep complete accounts of their gaming wins and losses. In some circumstances, when a taxpayer establishes that he paid or incurred a deductible expense but does not establish its precise amount, we may estimate the amount allowable. See Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). In order for the Court to do this, we must have some basis upon which an estimate can be made. See Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); Vanicek v. Commissioner, 85 T.C. 731, 743 (1985). The question in this case is essentially one of substantiation: whether petitioner can substantiate his losses to a degree sufficient for us to estimate, using our best judgment, that his gambling losses exceeded his gambling winnings. See LaPlante v. Commissioner, T.C. Memo. 2009-226, 98 T.C.M. (CCH) 305, 308 (2009); Gagliardi, 95 T.C.M. (CCH) at 1049.

[*14] In past cases taxpayers have substantiated gambling losses with such evidence as "casino ATM receipts, canceled checks made payable to casinos, * * * and credit card statements stating that cash was advanced at the casinos." Jackson v. Commissioner, T.C. Memo. 2007-373, 94 T.C.M. (CCH) 611, 611 n.2 (2007). We have also considered transactions appearing on a taxpayer's bank statements, the taxpayer's lifestyle (modest or luxurious), and his overall financial position. See Gagliardi, 95 T.C.M. (CCH) at 1050; Doffin v. Commissioner, T.C. Memo. 1991-114, 61 T.C.M. (CCH) 2157, 2162 (1991); cf. Jackson, 94 T.C.M. (CCH) at 612 (noting the taxpayer's failure to submit the latter forms of evidence). In Gagliardi, 95 T.C.M (CCH) at 1052, we considered expert testimony from Mr. Nicely regarding the taxpayer's likelihood of having net gambling winnings given the frequency of his gambling.

B.    Petitioner's Gambling Losses

Respondent determined that petitioner in 2014 had gambling winnings of $350,241. This total was calculated by summing all of petitioner's winnings reported on Forms W-2G, that is, all individual jackpots equal to or greater than

[*15] $1,200. We find that petitioner has provided evidence sufficient to substantiate a deduction for gambling losses of at least $350,241.[4]

Petitioner's financial records support his contention that he did not have net gambling winnings during 2014. He withdrew $240,113 from his credit union and credit card accounts on the premises of the casinos where he gambled. The parties have stipulated that he used this money to gamble.

Petitioner's financial accounts reveal no increase in his net worth that could be evidence of net gambling winnings during 2014. His credit union accounts for 2014 had aggregate opening balances of $1,365 and aggregate closing balances of $608. His Industrial Bank account had an opening balance of $233 and a closing balance of $8,598, despite his having deposited a $150,000 insurance settlement into that account on March 14, 2014. We found credible petitioner's testimony that the bulk of this $150,000 was dissipated gambling.

---

[4]Respondent argues that petitioner may also have won smaller prizes. But respondent did not assert in the notice of deficiency or in his answer that petitioner had unreported gambling winnings apart from the $350,241 shown on the Forms W-2G. See Gagliardi v. Commissioner, T.C. Memo. 2008-10, 95 T.C.M. (CCH) 1044, 1051 (2008) (declining to consider such an argument when it was raised for the first time at trial). In any event, respondent would have the burden of proof to show an increased deficiency, see Rule 142(a), and he has not attempted to meet that burden.

**[*16]** Petitioner had no other checking accounts, brokerage accounts, certificates of deposit, or investment assets. His sole retirement account, worth about $75,000 in 2004, had been depleted to $2,725 by year-end 2014. His credit cards at year-end 2014 had an aggregate balance due of $28,243. He testified that he did not pay these debts because he did not have the money to do so, and his bank records confirm that he did not.

Petitioner maintained a modest lifestyle (apart from gambling), and he made no significant changes to his lifestyle during 2014. He took no vacations; he purchased no real estate, jewelry, or other expensive personal property; and he made no large gifts. Indeed, he and his family experienced some financial hardships: Their house was subject to a tax sale in 2014, and they were often late paying bills. Collectively this evidence convinces us that petitioner could not have had any net gambling winnings during 2014.

Mr. Nicely's report confirms that conviction. Using established statistical techniques, he concluded with a 99% level of certainty that petitioner not only suffered gambling losses that wiped out his gambling winnings, but that he sustained at least $151,690 in net gambling losses during 2014. Taking into account the frequency with which petitioner gambled and the expected win percentages at the casinos where he gambled, Mr. Nicely estimated that the odds against petitioner's

**[\*17]** having earned even \$1 of net gambling profit during 2014 were 140 million to 1. On these facts we have no trouble finding that petitioner has provided sufficient evidence to show that his gambling losses were at least \$350,241.

C.    Respondent's Contentions

Respondent urges that records maintained by DD and Horseshoe, the two casinos at which petitioner gambled the least, see supra pp. 6-7, show that he had net gambling winnings for 2014. But these records were incomplete: The casinos kept track only of jackpots of \$1,200 or more and other transactions where petitioner was using his rewards card. Petitioner credibly testified that he often did not use these cards, either because he forgot or because he believed not using the cards could change his luck. The casinos' records were thus biased, being more likely to show wins than losses. See Lutz v. Commissioner, T.C. Memo. 2002-89, 83 T.C.M. (CCH) 1446, 1451 (2002) (declining to give weight to similar casino records); Mayer v. Commissioner, T.C. Memo. 2000-295, 80 T.C.M. (CCH) 393, 396 (2000) (same), aff'd, 29 F. App'x 706 (2d Cir. 2002).

Respondent criticizes the methodology that Mr. Nicely used in his report, asserting that it is based on "uncertain or flawed assumptions." We disagree. The Court in Gagliardi found persuasive a similar report prepared by Mr. Nicely, in which he used the same types of casino data and similar statistical techniques to

[*18] generate his results.  Indeed, Mr. Nicely testified that the information available to him in the instant case was more detailed and complete than the information available to him in Gagliardi.[5]

Respondent seeks to portray Mr. Nicely's conclusions as implausible by extrapolating his results to future years, urging that petitioner could not have sustained annual net gambling losses of $151,690 indefinitely.  But Mr. Nicely's conclusions were based on the frequency of petitioner's gambling during 2014 and the amounts of money he gambled.  Petitioner credibly testified that his gambling varied from year to year depending chiefly on how much cash he had available.  In March 2014 he received an insurance settlement of $150,000, and he appears to have lost almost all that money gambling.  Because petitioner's income during 2014 was unusually large--the one-time insurance settlement was almost 200% of his regular income for 2014--his gambling losses in 2014 were unusually large.  The broader point of Mr. Nicely's report is that, in a game with odds that disfavor the gambler, the law of large numbers means that a gambler who plays long

---

[5]In his brief respondent renews his motion in limine to exclude Mr. Nicely's report.  We denied that motion at trial and deny it again here.

[*19] enough is virtually guaranteed to have net losses. And there is no doubt that petitioner played long enough.[6]

Finally, the cases on which respondent relies are distinguishable because in each instance the taxpayer had a failure of proof. In Schooler v. Commissioner, 68 T.C. 867, 869-870 (1977), the taxpayer could not show that money he borrowed went towards gambling. Here, petitioner demonstrated a pattern of gambling that exhausted all of his income, and then some. Cf. Scoccimarro v. Commissioner, T.C. Memo. 1979-455, 39 T.C.M. (CCH) 486, 487 (1979) (discounting racetrack betting tickets the taxpayer produced because they appeared inauthentic); Donovan v. Commissioner, T.C. Memo. 1965-247, 24 T.C.M. (CCH) 1325, 1326 (1965) (finding that taxpayer failed to show that money had been spent on gambling as opposed to living expenses), aff'd, 359 F.2d 64 (1st Cir. 1966).

D.    Business Expense Deduction

Section 162(a) allows a deduction for ordinary and necessary expenses paid or incurred in a trade or business. Petitioner claims a deduction of $402 for the purchase of a computer allegedly used in his Schedule C consulting business. He

---

[6]Respondent advances a complex argument in an effort to show that Mr. Nicely, an expert in statistics, improperly computed standard deviation. Because respondent offered no expert testimony to counter Mr. Nicely's report, we decline to consider this argument. Standard deviation was an important element of Mr. Nicely's calculations in Gagliardi, and we found his report there persuasive.

[*20] bears the burden of proving his entitlement to this deduction. See sec. 6001; INDOPCO, 503 U.S. at 84; sec. 1.6001-1(a), (e), Income Tax Regs.

Section 274(d) imposes relatively strict substantiation requirements for deductions claimed for (among other things) "listed property." As in effect during 2014, "listed property" included "any computer." Sec. 280F(d)(4)(A)(iv); sec. 1.280F-6(b)(1)(iv), Income Tax Regs. These heightened substantiation requirements did not apply, however, if the computer was used exclusively at a regular business establishment. See sec. 280F(d)(4)(B); sec. 1.280F-6(b)(5), Income Tax Regs. A regular business establishment could include "a portion of the dwelling unit which is exclusively used on a regular basis * * * as the [taxpayer's] principal place of business." Sec. 280A(c)(1)(A).

Petitioner testified that he used the computer for his consulting business and that he did all his consulting work from home. But he did not attempt to show that any part of his home was set aside exclusively for such business use. He therefore must meet the heightened substantiation requirements of section 274(d).

No deduction is allowed under section 274(d) unless the taxpayer substantiates, by adequate records or by sufficient evidence corroborating his own statements, the amount, time and place, and business purpose for each expenditure. Sec. 1.274-5T(a), (b), and (c), Temporary Income Tax Regs., 50 Fed. Reg. 46016-

**[\*21]** 46025 (Nov. 6, 1985).  Petitioner supplied no records documenting business use of his laptop, and his wife could not corroborate that he used it solely for work.  His only evidence was his own statement, which we found unconvincing.  In any event his uncorroborated statement does not satisfy the statutory requirements.  See Haskins v. Commissioner, T.C. Memo. 2019-87, at \*36-\*37 (finding taxpayer's uncorroborated testimony insufficient to meet the substantiation requirements of section 274(d)), aff'd, 820 F. App'x 994 (11th Cir. 2020).

To reflect the foregoing,

Decision will be entered under

Rule 155.