T.C. Memo. 2008-10

UNITED STATES TAX COURT

FRANCIS M. GAGLIARDI, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23912-05.            Filed January 24, 2008.

<u>Eric D. Swenson</u> and <u>Allison D. Cato</u>, for petitioner.

<u>Michael S. Hensley</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined the following deficiencies in, additions to, and penalties on petitioner's Federal income tax:

|      |            | Additions to Tax | | Penalty |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6662 |
|------|------------|-----------------|-----------------|-----------|
| 1999 | $212,100   | --              | --              | $42,420   |
| 2000 | 370,017    | $45,848         | [1]             | 36,679    |
| 2001 | 429,787    | --              | --              | 85,957    |

[1]  The sec. 6651(a)(2) addition to tax is 0.5 percent of the unpaid tax liability that will be added to the tax for each month, or fraction thereof, of nonpayment, up to a maximum of 25 percent, based upon the liability shown on the sec. 6020(b) return, or the final determined liability, if less.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

In the answer, respondent conceded the section 6651(a)(2) addition to tax.  Additionally, respondent alleged that the correct amounts of deficiencies in, additions to, and penalties on petitioner's Federal income tax are as follows:[1]

|      |            | Addition to Tax | Penalty   |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6662 |
|------|------------|-----------------|-----------|
| 1999 | $207,244   | --              | $41,449   |
| 2000 | 300,102    | $44,899         | 60,020    |
| 2001 | 429,487    | 69,908          | 85,897    |

The issues for decision are:  (1) Whether petitioner substantiated the amounts of his claimed gambling losses for 1999, 2000, and 2001; (2) whether petitioner is liable for additions to tax pursuant to section 6651(a)(1) for 2000 and

[1]  Amounts are rounded to the nearest dollar.

2001; and (3) whether petitioner is liable for penalties pursuant to section 6662(a) for 1999, 2000, and 2001.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference. At the time he filed the petition, Francis M. Gagliardi (Mr. Gagliardi) resided in El Cajon, California.

Mr. Gagliardi's Life Before 1991

Mr. Gagliardi did not graduate from high school. The last year Mr. Gagliardi attended high school was 1979.

After high school, Mr. Gagliardi was employed as a machine operator by Buck Knives. Following his work at Buck Knives, from approximately 1984 to 1987 Mr. Gagliardi worked as a truck driver for his brother Dan Gagliardi.

In 1989, Mr. Gagliardi purchased an 18-wheel truck and thereafter ran his own trucking business, called American Redball, as a sole proprietorship. Mr. Gagliardi's duties for American Redball included running the business and driving the truck. Mr. Gagliardi hauled materials for military defense shows and trade shows.

While operating American Redball, Mr. Gagliardi did not keep a log of his income and expenses; instead he kept his receipts for the preparation of his income tax returns. Mr. Gagliardi

knew that he had to substantiate his claimed deductions related to American Redball with receipts, and he provided his business receipts to his tax return preparer.

Eugene Hunner (Mr. Hunner) prepared Mr. Gagliardi's tax returns when Mr. Gagliardi owned American Redball. Mr. Hunner has a B.A. in accounting and is a certified public accountant. He worked 5 years at a national accounting firm, is two courses shy of his master's in tax at the University of Southern California, and has prepared tax returns for over 30 years. Ninety percent of Mr. Hunner's professional work is preparing tax returns. Mr. Hunner prepares between 120 and 160 returns per year.

## 1991: Mr. Gagliardi Wins the Lottery

In 1991, Mr. Gagliardi won approximately $26,660,000 from the California lottery (lottery proceeds). Mr. Gagliardi elected to receive payment of the lottery proceeds in 20 annual payments of approximately $1,333,000 each (original annual lottery payment).

At the time he won the lottery proceeds, Mr. Gagliardi was 29 years old, was married, and had two children. Since winning the lottery proceeds, Mr. Gagliardi has not been employed. After winning the lottery proceeds, and before 1996, Mr. Gagliardi purchased a new home and custom-built motorcycles and regularly went on vacations. With the exception of the above expenditures

and other living costs, before 1996 Mr. Gagliardi generally saved most of his lottery winnings.

## 1994: Mr. Gagliardi and His Wife Divorce

During 1994, Mr. Gagliardi and his wife divorced. Pursuant to the property settlement in the divorce decree, Mr. Gagliardi and his ex-wife evenly split the original annual lottery payment. Accordingly, after the divorce, Mr. Gagliardi's gross annual lottery payment was $666,500 (gross annual lottery payment).

After Mr. Gagliardi divorced, his two children lived with his ex-wife in Marin County, California. Pursuant to the divorce decree, he received visitation rights with his children.

## Mr. Gagliardi's Gambling From 1996 Through 1998

In or around 1996, Mr. Gagliardi had a friend who was dying of cancer. In 1996, Mr. Gagliardi's friend asked Mr. Gagliardi to be his companion on a trip to one of the casinos owned and operated by California Indian tribes in San Diego County (the casinos).

Mr. Gagliardi gambled infrequently before winning the lottery. After the trip with his friend, Mr. Gagliardi started playing the slot machines at the casinos[2] frequently and became a

---

[2] Some of the casinos that Mr. Gagliardi gambled at included Sycuan, Viejas, Barona, and Pala. Sycuan is approximately 8 to 10 miles from Mr. Gagliardi's house, Viejas is approximately 20 miles from Mr. Gagliardi's house, and Barona is approximately 15 miles from Mr. Gagliardi's house. He gambled most frequently at Sycuan because it is the casino closest to his house.

"pathological gambler".  Since becoming a pathological gambler, Mr. Gagliardi has liquidated most of his investments and savings to gamble.  Mr. Gagliardi gambled heavily during 1997 and 1998.

Before winning the lottery proceeds, Mr. Gagliardi seldom bought lottery tickets.  Since he began gambling at the casinos, Mr. Gagliardi has bought lottery tickets outside of the casinos every couple of days.

Mr. Gagliardi's Gambling During 1999, 2000, and 2001

Mr. Gagliardi spent most of his waking hours at the casinos.[3] He had no outside interests, and generally if he was not at the casinos he was at home.  A typical day for Mr. Gagliardi generally consisted of waking up, showering, going to a 7-Eleven, getting coffee, going to the casinos, gambling, returning home, sleeping, waking up, and returning to the casino immediately thereafter.[4]  Occasionally, Mr. Gagliardi spent up to 48 hours continuously in the casinos before returning home.

Mr. Gagliardi spent an average of 20 days per month at the casinos (at least 209 days, 260 days, and 257 days during 1999, 2000, and 2001, respectively).  The following is a summary of the

---

[3]  During January, February, and March of 1999, Mr. Gagliardi was admitted into Sober Living by the Sea for his gambling disorder.  However, Mr. Gagliardi sneaked out of the facility to gamble.

[4]  On the day of trial, Mr. Gagliardi was gambling at one of the casinos until 5 a.m. (trial started at approximately 9:30 a.m.) and in his testimony implied that he would return to the casinos to gamble after the trial was over.

total numbers of documented days Mr. Gagliardi was at the casinos:[5]

| Month | 1999 | 2000 | 2001 |
|-------|------|------|------|
| January | 13 | 26 | 24 |
| February | 4 | 18 | 21 |
| March | 8 | 22 | 24 |
| April | 19 | 20 | 27 |
| May | 16 | 24 | 19 |
| June | 12 | 25 | 21 |
| July | 22 | 22 | 15 |
| August | 18 | 23 | 19 |
| September | 25 | 22 | 23 |
| October | 25 | 22 | 24 |
| November | 26 | 11 | 20 |
| December | 21 | 25 | 20 |
| Total | 209 | 260 | 257 |

In addition to the documented days, which are supported by a summary calendar of Mr. Gagliardi's Forms W-2G, Certain Gambling Winnings, "jackpot" winnings, winnings of $1,200 or more, and cash withdrawals at various casinos (the gambling calendars),[6] Mr. Gagliardi gambled at the casinos on days not reflected on the gambling calendars (i.e., in addition to the 209, 260, and 257 documented days for 1999, 2000, and 2001, respectively). Such

---

[5] During January, February, and March of 1999, Mr. Gagliardi was admitted into Sober Living by the Sea for his gambling disorder. This accounts for the lower number of days gambled during this period.

[6] Petitioner attached gambling calendars as an appendix to his opening brief. Attachments to a brief are not evidence. See Rules 143(b), 151(e). The parties, however, stipulated the gambling calendars, and the Court received them into evidence at trial. Accordingly, we rely on the gambling calendars admitted into evidence at trial and not the documents attached to petitioner's brief.

"undocumented days" generally were days in which (1) Mr. Gagliardi had funds left over from the prior day to fund his current day's gambling, and/or (2) Mr. Gagliardi did not hit a jackpot (no Form W-2G was issued to him by the casino).

On those days when he was at the casinos, Mr. Gagliardi spent 8 to 48 hours continuously in the casinos, averaging approximately 10 hours per day. While at the casinos, Mr. Gagliardi exclusively wagered[7] on slot machines, including a game called "Wildfire". After Mr. Gagliardi put cash into a slot machine, he never cashed out; he would always "play it off". While playing a slot machine, Mr. Gagliardi would place at a minimum four or five bets per minute. His average wager at a slot machine at a minimum was $9. A significant number of Mr. Gagliardi's wagers were $16 per slot machine spin, and some wagers cost $100 or $200 per slot machine spin.

The money that Mr. Gagliardi used to gamble at the casinos came from (1) cash from his prior trips to the casinos,[8] (2) an automatic teller machine (ATM) at a 7-Eleven on his way to the casinos, (3) an ATM inside the casinos, (4) checks written at the casinos, (5) credit cards, and/or (6) any winnings from slot

---

[7] For convenience, we use the terms "wagered", "bet", "wager", "betting", "wagering", etc. interchangeably.

[8] The only time Mr. Gagliardi left a casino with any money was when he won a jackpot.

machine play that day.[9]  On the rare occasions when he left the casino with any money, Mr. Gagliardi would bring the money back to the casino the following day, and he would then gamble with, and eventually lose (either the next day or shortly thereafter), that money.  On numerous days, Mr. Gagliardi would make multiple, sporadic cash withdrawals, rather than large cash withdrawals, at the casinos to fund his slot machine play.  He took the money out in smaller sums, rather than large sums, because he did not plan on losing as much money as he eventually withdrew.

The following is a summary of the total numbers of documented cash withdrawals Mr. Gagliardi made at the casinos:

| Month | 1999 | 2000 | 2001 |
|---|---|---|---|
| January | 33 | 47 | 30 |
| February | 6 | 62 | 55 |
| March | 12 | 77 | 47 |
| April | 46 | 61 | 57 |
| May | 46 | 65 | 34 |
| June | 31 | 57 | 46 |
| July | 64 | 35 | 27 |
| August | 54 | 48 | 47 |
| September | 67 | 49 | 57 |
| October | 64 | 45 | 49 |
| November | 68 | 13 | 36 |
| December | 67 | 64 | 28 |
| Total | 558 | 623 | 513 |

In addition to these documented withdrawals at the casinos, which are supported by the gambling calendars, Mr. Gagliardi withdrew additional cash outside of the casinos' premises and used it to

---

[9]  Mr. Gagliardi opined that he "could wallpaper my bathrooms with just the ATM receipts for millions of dollars."

gamble at the casinos. Mr. Gagliardi used the documented cash withdrawals at the casinos for slot machine play and lost the cash gambling at the casinos except for the amounts spent on a few meals he purchased there.

Mr. Gagliardi won jackpots ($1,200 or more) that were reported on the Forms W-2G.[10] When Mr. Gagliardi won a jackpot, the slot machine he was playing would "lock up" (the slot machine could not be wagered on) while a casino cashier would come to the machine, get a ticket out of the machine, get a Form W-2G, get Mr. Gagliardi's signature, and give Mr. Gagliardi the jackpot in cash. The time from when the slot machine locked up until Mr. Gagliardi could wager on that machine again could be anywhere from 5 minutes to an hour. When a slot machine locked up because he won a jackpot, Mr. Gagliardi often would go to an ATM to withdraw cash so that he could gamble on a different slot machine until the casino cashier delivered the jackpot money. The casinos paid Mr. Gagliardi any jackpot winnings of $1,200 or more in cash. Often, Mr. Gagliardi lost $1,200 or more on a different slot machine by the time the Form W-2G was prepared and he received the jackpot money. Mr. Gagliardi did not enjoy winning jackpots because the machine locked up and he had to spend time

---

[10] Mr. Gagliardi also won amounts of less than $1,200, the amount that triggers the requirement for the casino to issue a Form W-2G.

waiting for money to gamble (either from the casino or by having to go get money from an ATM).

Mr. Gagliardi did not get emotionally excited when he won at the slot machines. Mr. Gagliardi did not get excited when he won jackpots of $1,200 or greater because the slot machine would freeze or lock up until he was issued his slot machine winnings and a Form W-2G by the casino. Furthermore, Mr. Gagliardi knew that eventually he would lose any winnings playing the slot machines.

Mr. Gagliardi lived with his girlfriend, Susan Serum (Ms. Serum). Ms. Serum went with Mr. Gagliardi to the casinos and watched him gamble away his money. While watching Mr. Gagliardi gamble, Ms. Serum saw that he did not get excited and did not enjoy playing the slot machines. Initially, Ms. Serum and Mr. Gagliardi would drive to the casinos together. At some point, Ms. Serum began to take her own car because the ride home from the casinos was "no fun". When she rode with Mr. Gagliardi, she stayed at the casinos with him until he left. Often, Ms. Serum would just follow Mr. Gagliardi around and watch him gamble. In or around 2003, Ms. Serum ended her relationship with Mr. Gagliardi as he was never home because of his pathological gambling disorder. After she moved out of Mr. Gagliardi's home, he did not notice that she was gone until 2 or 3 days later.

Mr. Gagliardi did not take any vacations during the years in issue.[11]  Mr. Gagliardi did not have time for or live a lavish lifestyle as his life was playing slot machines at the casinos. Mr. Gagliardi had his home foreclosed upon on at least two occasions because he was too preoccupied gambling to make the necessary mortgage payments to the bank.

Mr. Gagliardi's children would fly down from Marin County "every couple weeks" to stay with Mr. Gagliardi.  Mr. Gagliardi continued to gamble, even for long periods, while his children came to visit him.

Gambling Log and Mr. Gagliardi's Gambling Records

Mr. Gagliardi did not maintain a contemporaneous "gambling diary" or a "gambling log" that reflected his winnings and losses from gambling on the slot machines at the casinos.  Mr. Hunner did not advise Mr. Gagliardi to maintain a contemporaneous gambling log or diary.

---

[11]  At one point during the years in issue, however, Mr. Gagliardi and Ms. Serum were going to go to Las Vegas, Nevada. While driving to Las Vegas, Mr. Gagliardi told Ms. Serum that he had to go to the bathroom and they could stop at one of the casinos so he could use the bathroom.  Ms. Serum objected, but they stopped at one of the casinos approximately 90 miles from San Diego.  Mr. Gagliardi quickly lost $10,000.  After losing the $10,000, and without using the bathroom, Mr. Gagliardi got back in the car and he and Ms. Serum drove home.

On one Valentine's Day, Mr. Gagliardi told Ms. Serum that he rented a room at a five-star hotel for the weekend with the Valentine's Day package.  Ms. Serum picked up Mr. Gagliardi, and the next thing she knew he was driving towards San Diego to go to one of the casinos to gamble.

Mr. Gagliardi knew that all of the Forms W-2G issued by the casinos would be reported to the Internal Revenue Service (IRS). Occasionally the casinos made errors on the Forms W-2G issued to Mr. Gagliardi. When he noticed the errors, he would call the casinos and they would correct these errors.

Mr. Gagliardi retained all his receipts and records related to his gambling winnings and losses, including but not limited to: ATM receipts, copies of checks cashed at the casinos, bank and credit card statements reflecting withdrawals made at the casinos, and Forms W-2G he received from the casinos. Mr. Gagliardi provided his tax return preparer (Mr. Hunner) with all his receipts and records related to his gambling winnings and losses for use in preparing Mr. Gagliardi's income tax returns for the years in issue. This was the same method employed by Mr. Gagliardi and Mr. Hunner when Mr. Gagliardi owned American Redball (his trucking business), and Mr. Gagliardi provided the similar records and receipts to Mr. Hunner. Mr. Gagliardi believed that the records he provided to Mr. Hunner substantiated his expenses (i.e., gambling losses), just as with American Redball.

## Mr. Gagliardi's Tax Returns and Respondent's Determinations for 1999, 2000, and 2001

Federal income tax of $186,621, $186,623, $183,431 (totaling $556,675) was withheld from the gross annual lottery payments made to Mr. Gagliardi during 1999, 2000, and 2001, respectively.

Additionally, child support of approximately $6,500 per month was deducted from the gross annual lottery payments made to Mr. Gagliardi during the years in issue.

Mr. Hunner prepared Mr. Gagliardi's Federal income tax returns for 1997, 1998, and the years in issue. Mr. Hunner used the same method to prepare Mr. Gagliardi's returns for 1997 and 1998 as he did for the years in issue. Mr. Hunner never stated to Mr. Gagliardi that the records Mr. Gagliardi gave to him were inadequate to prepare his tax returns.

After receiving voluminous documentation and records from Mr. Gagliardi regarding his gambling during the years in issue, Mr. Hunner was comfortable preparing Mr. Gagliardi's returns for the years in issue, especially with regard to the gambling loss deductions claimed on the returns, given the nature and extent of Mr. Gagliardi's gambling. Mr. Hunner believed that Mr. Gagliardi's gambling losses were greater than the amounts of gambling loss deductions claimed on Mr. Gagliardi's returns. Mr. Gagliardi reported the following amounts on his returns:

| Year | Casino Winnings | State Lottery Winnings | Casino Losses |
| --- | --- | --- | --- |
| 1999 | $127,073 | $666,500 | ($502,433) |
| 2000 | 270,052 | 666,500 | (802,921) |
| 2001 | 631,629 | 666,500 | (1,170,140) |

In calculating the amounts of gambling loss deductions to claim on Mr. Gagliardi's returns, Mr. Hunner added all of Mr. Gagliardi's checks, charges, and withdrawals made at the casinos

to the sum of the amounts shown as income on the Forms W-2G that Mr. Gagliardi received from the casinos. Additionally, for 1999, Mr. Hunner added $1,610 for losses from lottery scratchers. Mr. Hunner, to be conservative, did not include cash withdrawals Mr. Gagliardi made outside the casinos (thousands of dollars)--e.g., at 7-Eleven--in calculating the amounts of Mr. Gagliardi's gambling losses. Mr. Hunner calculated and reported the amounts of Mr. Gagliardi's gambling losses on Mr. Gagliardi's returns for the years in issue on the basis of the fact that Mr. Gagliardi left the casinos with no money or if he left with money, he returned the following day to the casino and lost it all. All gifts that Mr. Gagliardi made during the years in issue were accounted for in determining the reasonableness of the amounts of gambling losses claimed for the years in issue.

In 1999, Mr. Gagliardi received a Federal income tax refund of $153,669 for 1998. In 2000, Mr. Gagliardi received a Federal income tax refund of $104,655 for 1999. Petitioner lost his 1998 and 1999 refunds gambling at the casinos.

Mr. Gagliardi timely filed his Federal individual income tax return for 1999. In May 2003, Mr. Gagliardi submitted his 2000 and 2001 Forms 1040, U.S. Individual Income Tax Return (2000 and 2001 returns). Mr. Gagliardi did not timely file his 2000 and 2001 returns because: (1) He was entitled to a refund for each year; (2) he thought if he did not file returns, then the refunds

would serve as a "forced savings account"; and (3) he did not want the refunds for the years 2000 and 2001 because he thought he would spend the tax refunds on gambling at the casinos. Mr. Gagliardi "wanted to save that money for later when I run out of money."

Respondent determined that Mr. Gagliardi failed to report $24,340, $270,052, and $4,521 of gambling income for 1999, 2000, and 2001, respectively. The parties agree that respondent's aforementioned determinations for 1999 and 2000 should be reduced by $21,732 to $2,608 for 1999 and by $53,785 to $216,267 for 2000. Petitioner did not contest, at trial or on brief, respondent's determination that he failed to report $4,521 of gambling income for 2001. We conclude that petitioner has conceded or abandoned this item. See Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Money v. Commissioner, 89 T.C. 46, 48 (1987).

Respondent concedes that Mr. Gagliardi is entitled to gambling loss deductions (i.e., that his casino losses exceeded his casino winnings) of $2,181, $24,473, and $59,151 for 1999, 2000, and 2001, respectively.

### ULTIMATE FINDINGS OF FACT

Mr. Gagliardi gambled on slot machines and lost at the casinos (1) all of the money listed as withdrawals on the gambling calendars--$366,455, $509,719, and $499,729 for 1999,

2000, and 2001, respectively,[12] (2) all of the jackpots that he won (as shown on Forms W-2G) gambling, and (3) all gross gambling winnings won at the casinos not reported on the Forms W-2G.  Mr. Gagliardi's gambling losses for each of the years in issue exceeded the amounts of gambling losses respondent disallowed for 1999, 2000, and 2001.

OPINION

I.  Deficiencies

    A.  Applicable Law

Section 165(a) provides the general rule that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated by insurance or otherwise.  Section 165(d) limits the loss deduction of section 165(a), providing:  "Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions."

This is a substantiation case:  the issue is whether petitioner has substantiated the amounts of his gambling losses to the extent disallowed by respondent.  We note that the amount of gambling losses petitioner claimed and respondent disallowed does not exceed the amount of gambling income reported by petitioner, conceded by petitioner, or determined by respondent for 1999, 2000, or 2001, respectively.  Commissioner v.

---

[12]  The cash withdrawals reflected in the gambling calendars do not include the service charge per withdrawal incurred by Mr. Gagliardi.

Groetzinger, 480 U.S. 23, 32 n.11 (1987) (characterizing a State lottery as "public gambling" in a case treating gambling earnings as ordinary income); United States v. Maginnis, 356 F.3d 1179, 1183 & n.6 (9th Cir. 2004) (taxpayer's lottery winnings enter into the section 165(d) calculation as wagering gains that taxpayer's gambling losses at the casinos can be applied to in addition to taxpayer's gambling winnings at the casinos).

Our resolution of this dispute turns mainly on a determination of the credibility of the evidence presented.  The determination of the truth of a matter on the basis of the oral and documentary evidence "epitomizes the ultimate task of a trier of the facts--the distillation of truth from falsehood which is the daily grist of judicial life."  See Diaz v. Commissioner, 58 T.C. 560, 564 (1972).  We "must be careful to avoid making the courtroom a haven for the skillful liar or a quagmire in which the honest litigant is swallowed up.  Truth itself is never in doubt, but it often has an elusive quality which makes the search for it fraught with difficulty."  Id.; Hawkins v. Commissioner, T.C. Memo. 1993-517, affd. without published opinion 66 F.3d 325 (6th Cir. 1995).

We determine the credibility of each witness, weigh each piece of evidence, draw appropriate inferences, and choose between conflicting inferences.  See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 84 (2000), affd. 299 F.3d 221 (3d

Cir. 2002); see also <u>Gallick v. Baltimore & O.R. Co.</u>, 372 U.S. 108, 114-115 (1963); <u>Boehm v. Commissioner</u>, 326 U.S. 287, 293 (1945); <u>Wilmington Trust Co. v. Helvering</u>, 316 U.S. 164, 167-168 (1942). We decide whether evidence is credible on the basis of objective facts, the reasonableness of the testimony, and the demeanor of the witness. <u>Quock Ting v. United States</u>, 140 U.S. 417, 420-421 (1891); <u>Wood v. Commissioner</u>, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); <u>Pinder v. United States</u>, 330 F.2d 119, 124-125 (5th Cir. 1964); <u>Concord Consumers Hous. Coop. v. Commissioner</u>, 89 T.C. 105, 124 n.21 (1987). We have evaluated each witness's testimony by observing his or her candor, sincerity, and demeanor and by assigning weight to the elicited testimony. See <u>Neonatology Associates, P.A. v. Commissioner</u>, <u>supra</u> at 84.

If the taxpayer substantiates the deductions claimed, this satisfies the taxpayer's burden of proof under Rule 142. Accordingly, section 7491(a), regarding the shifting of the burden of proof with respect to the deficiencies in tax, is of little importance because if the taxpayer fails to substantiate an item, the burden of proof does not shift to the Commissioner. Sec. 7491(a)(2)(A).

B. <u>The Documentary Evidence</u>

Petitioner submitted documents entitled "1999 Summary of Gaming Activities", "2000 Summary of Gaming Activities", and

"2001 Summary of Gaming Activities" which included: (1) Supporting exhibits evidencing Mr. Gagliardi's Form W-2G jackpot winnings, (2) supporting exhibits evidencing cash withdrawals made by Mr. Gagliardi at various casinos, and (3) the gambling calendars.[13] The summaries of gaming activities list living expenses of $331,341, $251,943, $210,334 for 1999, 2000, and 2001, respectively.[14] The summaries of gaming activities were prepared using original, contemporaneous records from 1999, 2000, and 2001.

Petitioner submitted as evidence his bank statements, including various canceled checks, covering 1999, 2000, and 2001. Cash withdrawals he made during the years at issue at the various casinos were marked on the bank statements. Also included were checks he cashed at the various casinos.

Petitioner submitted as evidence his credit card statements for 1999, 2000, and 2001. Cash withdrawals he made during the years at issue at the various casinos via his credit cards were marked on the credit card statements.

_____

[13] Mr. Hunner testified that the casinos are not cooperative in providing records about players' gambling, that the casino personnel stated that they do not keep much documentation regarding a player's gambling, and that the casinos do not retain the videos they shoot.

[14] Additionally, during the years in issue, approximately $145,000 from Mr. Gagliardi's lottery proceeds, his Federal tax refunds, and the proceeds from the sale of his investments were available to Mr. Gagliardi to gamble with or use for living expenses. See cashflow analysis, infra p. 21.

Mr. Gagliardi and his brother assisted Mr. Hunner in preparing: (1) The gambling calendars showing most of Mr. Gagliardi's gambling activities for 1999 through 2001, (2) summaries of Mr. Gagliardi's living expenses for 1999 through 2001, and (3) net worth analyses of Mr. Gagliardi for 1999 through 2001 (based on records from those years). Mr. Gagliardi reviewed the summaries of living expenses and net worth statements to ensure they were complete and accurate.

Mr. Gagliardi and his brother assisted Mr. Hunner in preparing a cashflow analysis with supporting documents for each line item, including a related summary of living expenses for Mr. Gagliardi, for 1999, 2000, and 2001 using records from the respective tax years (cashflow analysis). The cashflow analysis showed the following:

| | 1999 | 2000 | 2001 | Total |
|---|---|---|---|---|
| California lottery | $666,500 | $666,500 | $666,500 | $1,999,500 |
| Less: Federal income tax | (186,621) | (186,623) | (183,431) | (556,675) |
| | 479,879 | 479,877 | 483,069 | 1,442,825 |
| Sale of America funds | 160,014 | 330,000 | 191,198 | 681,212 |
| Interest and dividends | 1,420 | 688 | 639 | 2,747 |
| Prior year Federal income tax refund | 153,669 | 104,655 | none received | 258,324 |
| Form W-2G cash (casinos) | 127,073 | 270,052 | 631,629 | 1,028,754 |
| Net cash available | 922,055 | 1,185,272 | 1,306,535 | 3,413,862 |
| Living expenses | (331,341) | (251,943) | (210,334) | (793,618) |
| Gambling losses claimed | (502,433) | (802,921) | (1,170,140) | (2,475,494) |
| Cash remaining | 88,281 | 130,408 | (73,939) | 144,750 |

Mr. Hunner prepared net worth statements with supporting documents for each line item for Mr. Gagliardi as of December 31, 1998 through 2001 (net worth statements). The net worth statements were prepared using records from 1998, 1999, 2000, and 2001. The net worth statements reflect that Mr. Gagliardi did not have any unaccounted-for increase in his net worth from gambling activities for the years at issue.

Respondent claims that the summaries of living expenses do not include expenses Mr. Gagliardi incurred. Respondent objected to the documents listing petitioner's living expenses, stating:

> This is a document that respondent would have no way of corroborating whether it's true or not. We simply have to rely on the testimony of Mr. Gagliardi. Again, this is not the way the government can do business is [sic] simply relying on people's words. * * * [T]here's just absolutely no way I could know whether that was a complete list or an incomplete list, whether that was true or not true. I certainly wasn't with Mr. Gagliardi during that time period.[15]

---

[15] Ironically, the same could be said for a gambling log.

Additionally, respondent's counsel claimed that the Government cannot shoulder the burden of doing a net worth analysis in a case such as this. The Commissioner is not required to use indirect methods of proof to establish the amount of a gambler's losses. The evidence the Commissioner wishes to present and the expense and effort the Commissioner wishes to spend on any given case lie with the Commissioner. We note, however, that the Commissioner routinely uses the net worth method to reconstruct income in unreported income cases. See Holland v. United States, 348 U.S. 121 (1954).

Furthermore, respondent's counsel did not understand the difference between games of skill and games of chance and could not answer whether Rev. Proc. 77-29, 1977-2 C.B. 538 (the revenue

(continued...)

We find petitioner's summaries of living expenses to be credible. Respondent did not establish the amounts of any such expenses that were not included in the summaries of living expenses, and respondent failed to present evidence to rebut petitioner's summaries of living expenses.

C. No "Increased Deficiency"

At trial and on brief, respondent alleges that Mr. Gagliardi did not report all of his gambling winnings from the years in issue (i.e., that he reported only the gambling winnings

---

(...continued)
procedure), contains guidance aimed at games of chance, such as slot machines. But see Rev. Proc. 77-29, sec. 3.02, 1977-2 C.B. at 539. At trial respondent's counsel had great difficulty explaining exactly what a "gambling log" is and what petitioner should have recorded in a gambling log. Respondent's counsel stated that it was not realistic for someone to keep track of every bet and that the revenue procedure does not require taxpayers to keep track of every bet (i.e., the revenue procedure does not require a taxpayer to list how much he/she bet for each slot machine "pull"). Respondent's counsel contended that to keep a log for slot machine play, per the revenue procedure, a taxpayer must know how much was wagered and how much was lost and record it contemporaneously. But see id.

We also note that the revenue procedure provides that "Verifiable documentation for gambling transactions includes but is not limited to" Forms W-2G, wagering tickets, canceled checks, credit records, and bank withdrawals--all of which are present here. Id. sec. 3, 1977-2 C.B. at 538. Additionally, the revenue procedure provides a method, keeping a gambling log, that the IRS will consider as acceptable evidence for substantiation of wagering winnings and losses. Id. It does not contain the exclusive method for substantiating gambling losses. Id. sec. 1, 1977-2 C.B. at 538 ("The purpose of this revenue procedure is to provide guidelines to taxpayers concerning the treatment of wagering gains and losses for Federal income tax purposes and the related responsibility for maintaining adequate records in support of winnings and losses.").

reflected on Forms W-2G).  Respondent did not determine in the notice of deficiency, assert in the answer, or pursuant to Rule 41 move to amend the pleadings to assert that Mr. Gagliardi had any unreported gambling winnings for the years in issue. Generally, we will not consider issues that are raised for the first time at trial or on brief.  See Foil v. Commissioner, 92 T.C. 376, 418 (1989), affd. 920 F.2d 1196 (5th Cir. 1990); Markwardt v. Commissioner, 64 T.C. 989, 997 (1975). Accordingly, respondent's proposed findings of fact regarding whether Mr. Gagliardi underreported his gambling winnings in amounts greater than those determined in the notice of deficiency for the years in issue are specious.[16]

D.  The Expert Witnesses

Respondent also attempted to discredit the two expert witnesses that testified at trial.

1.  Dr. Suzanne Pike

Dr. Suzanne Pike, a clinical psychologist with over 25 years' experience who specializes and has extensive experience in treating patients with gambling disorders (over 500 such patients), testified as an expert witness on behalf of

---

[16]  To the extent that respondent's briefs might be construed as respondent's arguing for an increased deficiency, we will not consider such arguments even if they are raised in respondent's briefs.  See Foil v. Commissioner, 92 T.C. 376, 418 (1989), affd. 920 F.2d 1196 (5th Cir. 1990); Markwardt v. Commissioner, 64 T.C. 989, 997 (1975).

petitioner.  Dr. Pike has been qualified to testify in both Federal and local courts as an expert witness on pathological gambling.  Dr. Pike is a member of the National Council on Problem Gambling, the California Council on Problem Gambling, and the American Psychological Association.

Pursuant to a clinical interview and mental assessment of Mr. Gagliardi, including the use of two widely accepted assessment procedures (a.k.a. gambling screens) in the medical field--the South Oaks Gambling Screen and the Diagnostic Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV)[17] Pathological Gambler Criteria--Dr. Pike concluded that Mr. Gagliardi suffered from a pathological gambling disorder during the tax years at issue.  A pathological gambling disorder is a type of impulse control disorder and mental illness, not an "addiction".  This disorder is accepted by the scientific community and is in a category with kleptomania (the impulse to steal stemming from emotional disturbance rather than economic need) and trichotillomania (pulling hair).  Dr. Pike concluded that Mr. Gagliardi suffered "from the almost delusional belief that if he gambled long enough, he'd win everything back or break even."

---

[17]  The DSM-IV, published by the American Psychiatric Association, is the "diagnostic bible" used for diagnosing any and every mental illness.

Respondent attempted to discredit Dr. Pike by claiming her definition of "gambler's fallacy" was incorrect. Respondent relies on a definition of "gambler's fallacy" he obtained from Wikipedia. Respondent did not call any witness, or expert witness, to counter Dr. Pike's conclusions. Respondent's reliance on a definition of "gambler's fallacy" found in Wikipedia[18] is not persuasive. Dr. Pike and Mr. Nicely, a second expert witness whose testimony and opinions are discussed in greater detail infra, credibly explained that there is a difference in the definition of "gambler's fallacy" depending on the field of study--e.g., psychology versus mathematics. We find Dr. Pike to be credible and rely on her expert opinion.[19]

Dr. Pike corroborated Mr. Gagliardi's and Ms. Serum's testimony that if Mr. Gagliardi walked out of the casinos with money, he would return the next day or shortly thereafter and lose it. Dr. Pike stated that a pathological gambler, such as Mr. Gagliardi, who walks away from a casino with money will, with

_____

[18] Although we conclude that the information respondent obtained from Wikipedia was not wholly reliable and not persuasive in the instant case, we make no findings regarding the reliability, persuasiveness, or use of Wikipedia in general.

[19] We note that Dr. Pike testified that, unlike recreational and problem gamblers, pathological gamblers take the "gambler's fallacy" to a delusional level--they believe if they gamble long enough, they will win back all their losses and even more. Dr. Pike also opined that, unless treated for his illness, Mr. Gagliardi will gamble until he dies or loses all his money.

an extremely high probability, go back to a casino the next day with the money.

2. Mark Nicely

Mark Nicely (Mr. Nicely), a casino gaming industry and math expert with an expertise in math and slot machines, testified as an expert witness on behalf of petitioner. Mr. Nicely has a bachelor's degree from Rensselear Polytechnic Institute (which he attended on a full academic scholarship) from the Honors Program of the Electrical, Computer, and Systems Engineering Department. He has taken postgraduate classes at Stanford University and the University of California at Berkeley in software, software technology, and math (including statistics, probability, and financial analysis). Before working in casino gaming, Mr. Nicely had over 10 years' experience as a computer software engineer and in math and algorithm development.

At the time of trial, Mr. Nicely had worked in the gaming industry for 9 years. He received direct training from the director of slot operations at the Mirage in Las Vegas, Nevada. Mr. Nicely was vice president of marketing and promotion, and led the math department, at Silicon Gaming--a slot machine manufacturer. Mr. Nicely was responsible for the development of games and gaming math, testing equipment, working with regulators, and training employees on how to design games for casinos. After that, he was president and CEO of Wager Works and

later was executive vice president of marketing for Wynn Properties.  For a time, Mr. Nicely offered consulting services to gaming industry clients in six States and three foreign countries.  At the time of trial, he was the director of gaming and design at International Game Technology (IGT)--the largest slot machine manufacturer in the world.

Mr. Nicely knows and understands the gaming rules of different jurisdictions.  He has extensive dealings with regulators, slot floor operators, directors of slot operations, and vice presidents of operations in order to understand from them directly how the slot machines are working.  Mr. Nicely works with various jurisdictional bodies including the Great Britain Gaming Board, Alderney Gaming and Isle of Man, and officials from Montana and other States.

Mr. Nicely has worked on "class 3 slot machines",[20] "class 2 games",[21] online gaming, and table games.  He has access to casino operations data and performs analyses to determine whether various machines have been overpaying or underpaying gamblers.

---

[20]  "Class 3" slot machines are Nevada-style games where every outcome is completely independent.

[21]  "Class 2" machines have a pull tab--like a "scratcher"-- or are bingo-like games.  The outcomes on a class 2 machine are all predetermined for pull tabs.  Class 2 machines are analogous to a standard deck of 52 cards--if the four aces are removed from the deck, there is no chance of getting an ace on the next card. This continues until "the deal completes" (the culmination of all outcomes in a given set), and then it starts over again (like a fresh deck of 52 cards).

Mr. Nicely used the same analyses and techniques in this case. These analyses and techniques are used by all major slot machine manufacturers.

Mr. Nicely has no published articles because in his industry anything worthy of publication is a trade secret. There is a code of silence with respect to sharing information--publishing would amount to giving secrets away to the competition. For example, Mr. Nicely has solved a very difficult math problem associated with a process called "gambler's ruin". His associates do not have this analytical technique at their disposal, so they have to use simulators. Mr. Nicely's analytical solution is very powerful, and he would never publish it because it would be "spilling the beans" to his competitors.

Mr. Nicely is required to gamble on slot machines for market research. It is very important for him to gamble for "real" money so that he can feel the gambler's emotions. Accordingly, he gambles with his own money and is not reimbursed for his losses, which is industry policy, so that he feels what the machine is like. In every year that he has gambled on slot machines as part of his job, he has lost money (net).

Mr. Nicely credibly explained the simple five-step purely mechanical formula he used to calculate the likelihood and extent of Mr. Gagliardi's gambling losses at slot machines during the years in issue. Mr. Nicely had no discretion when calculating

the results using the aforementioned formula.  We find the methodology and assumptions made by Mr. Nicely to calculate the likelihood and extent of Mr. Gagliardi's gambling losses at slot machines during the years in issue to be reasonable.

Mr. Nicely opined on the basis of the extent of Mr. Gagliardi's gambling activity that (1) Mr. Gagliardi's breaking even from slot machine play was astronomically unlikely (substantially greater than 1 in 1 trillion);[22] and (2) the estimated net losses from slot machine play for the tax years 1999, 2000, and 2001 were most likely approximately $637,000, $678,000, and $507,000, respectively, with an error range of plus or minus $65,000, $72,000, and $83,000, respectively.

Mr. Nicely's estimate of Mr. Gagliardi's total <u>net</u> losses from slot machine play for the years at issue, $1,822,000 (with an error range of a maximum net loss of $2,042,00 and a minimum net loss of $1,602,000), is consistent and greater than Mr. Gagliardi's total claimed net gambling losses from slot machine play for the tax years at issue ($1,446,740).[23]  Additionally, the

---

[22]  Mr. Nicely explained that "7.5$\Sigma$" equals 1 in 13 trillion.  (Sigma ($\Sigma$) is also designated by "Z" and called a "Z score" or "Z factor".)  His calculations revealed that the possibility of Mr. Gagliardi's breaking even was "19$\Sigma$" which is infinitesimal (it is so small that the amount technically is incalculable and assigning a number to it is not practical).

[23]  Petitioner reported casino winnings of $127,073, $270,052, and $631,629 in 1999, 2000, and 2001, respectively. See <u>supra</u> p. 14.  Petitioner reported casino losses of $502,433,
(continued...)

net gambling losses from slot machine play Mr. Gagliardi claimed for 1999 and 2000 were significantly lower than the amount calculated by Mr. Nicely, and the amount claimed for 2001 was within the error range calculated by Mr. Nicely.

Respondent attempted to discredit Mr. Nicely by questioning the formula Mr. Nicely used and Mr. Nicely's assumptions[24] by which he determined, in his expert opinion, that there was only an infinitesimal probability that Mr. Gagliardi won money (i.e., net) gambling on slot machines during the years in issue.

---

[23](...continued)
$802,921, and $1,170,140 in 1999, 2000, and 2001, respectively. See supra p. 14.  Accordingly, Mr. Gagliardi's net losses from gambling at the casinos on slot machines totaled $1,446,740 ($375,360, $532,869, and $538,511 for 1999, 2000, and 2001, respectively).  This, however, does not include the $666,500 of State lottery winnings petitioner received each year during the years in issue.  Commissioner v. Groetzinger, 480 U.S. 23, 32 n.11 (1987) (characterizing a State lottery as "public gambling" in a case treating gambling earnings as ordinary income); United States v. Maginnis, 356 F.3d 1179, 1183 & n.6 (9th Cir. 2004) (taxpayer's lottery winnings enter into the sec. 165(d) calculation as wagering gains that taxpayer's gambling losses at the casinos can be applied to in addition to taxpayer's gambling winnings at the casinos); see supra p. 14.

[24]  For example, respondent took issue with the fact that Mr. Nicely assumed that Mr. Gagliardi played on average 7 hours per day on days Mr. Gagliardi gambled.  We found that on days when he was at the casinos, Mr. Gagliardi spent at a minimum an average of 10 hours per day at the casinos.  Accordingly, Mr. Nicely's assumptions were conservative and reasonable.  Using a lower number resulted in a greater likelihood that Mr. Gagliardi won money (i.e., net) gambling on slot machines--i.e., if Mr. Nicely had used 10 hours per day the figure he would have come up with would have made it even more improbable that Mr. Gagliardi won money (i.e., net) gambling on slot machines during the years in issue.

Respondent did not call any witness, or expert witness, to counter Mr. Nicely's conclusions. We find Mr. Nicely to be credible and rely on his expert opinion.

Mr. Nicely credibly explained why he used the figures for return to player (RTP) set forth in his report. Mr. Nicely stated that the machines petitioner played are "class 2 electronic pull tab machines" which have an RTP of between 55 and 90 percent. The operating manual for such machines states that the default setting is 80 percent RTP.

We conclude that Mr. Nicely's "best case scenario" of 90 percent RTP (the figure normally used in the gaming industry) for Mr. Gagliardi's expected wins or losses was reasonable, given his research,[25] his expert opinion that the casinos at which Mr.

---

[25] Mr. Nicely never worked for any of the casinos where Mr. Gagliardi gambled. The casinos are under no obligation to publish their RTP. Mr. Nicely researched the expected RTP at the casinos in such publications as the Wall Street Journal (70 percent RTP); the Sacramento Bee (90 percent RTP), which quoted Bill Eadington (the director of Study for Center of Gambling and Commercial Gaming at the University of Nevada Reno); and the Orange County Register (90 percent RTP). These news articles all were about RTP at California Indian Nation casinos.

Industry contacts of Mr. Nicely thought the casinos' RTP was in the low 80 percent range. Mr. Nicely also testified that Washington State promotes its Indian Nation gaming as having the best RTP in the United States and lists the RTP as between 70 percent and 90 percent.

Mr. Nicely also explained that on some slot machines a player can win a certain payout only if the player gambles the maximum amount--known as "buy a bet", "buy a pay", or "buy a bonus". The maximum expected RTP is obtained only by playing the maximum bet on this type of machine.

Gagliardi played reportedly had less than 90 percent RTP on their slot machines and the amount of RTP from the casinos varied, and that the maximum RTP on the "class 2" slot machines Mr. Gagliardi played was 90 percent.  Furthermore, on the basis of Mr. Nicely's report and testimony, we find that it is more likely that Mr. Gagliardi's expected wins or losses were accurately reflected by either the 83 percent or 70 percent RTP figures Mr. Nicely used rather than the 90 percent RTP calculation.

Respondent attempted to discredit Mr. Nicely by claiming that Mr. Nicely incorrectly calculated that Mr. Gagliardi played slot machines at a frequency of six times per minute, which was more often than Mr. Gagliardi actually played.  Mr. Gagliardi played the slot machines at the casinos at a frequency of at least four to five times per minute during the years in issue. In his expert report, Mr. Nicely used a figure of 250 bets per hour for his calculations.  This amounts to approximately 4.17 bets per minute (250 divided by 60).  Accordingly, we find that Mr. Nicely used a conservative, and reasonable, number of bets in his calculations to determine that there was only an infinitesimal chance that Mr. Gagliardi won money (i.e., net) gambling on slot machines during the years in issue.

Furthermore, Mr. Nicely testified that regardless of his calculations and methodology for determining Mr. Gagliardi's gambling losses, if Mr. Gagliardi spent all of his slot machine

winnings and cash withdrawals at the casinos on slot machine play, the best methodology to accurately determine Mr. Gagliardi's gambling losses for the years in issue would be to determine the total amount of money wagered on slot machine play. This methodology is substantially similar to the method Mr. Hunner used to compute Mr. Gagliardi's gambling losses.

E. Lay Witness Testimonial Evidence

Mr. Hunner credibly testified that on the unique facts in this case the methodology for determining and reporting gambling losses was accurate.

Ms. Serum corroborated the amount of time Mr. Gagliardi spent gambling at the casino slot machines during the years in issue. Ms. Serum corroborated that Mr. Gagliardi did not live a lavish lifestyle during the years in issue.

F. Conclusion

At trial, respondent argued: "When all of the facts of this case are presented, only one thing is going to be certain--that Mr. Gagliardi wants the Court to believe that his claimed losses * * * were incurred because he says so."[26] (Emphasis added.) We disagree. The voluminous contemporaneous and other documentary evidence, the corroborating testimonial evidence of an eyewitness

---

[26] Mr. Nicely stated that because Mr. Gagliardi gambled at Indian Nation casinos, which are less uniform than casinos elsewhere, it is uncertain whether using a Players' Club card on a "class 2 machine", or at an Indian Nation casino, could track all of a player's gambling.

to petitioner's gambling and daily activities during the years in issue and of petitioner's return preparer, and the testimonial evidence of two experts in addition to petitioner's testimony substantiate and establish that petitioner incurred the disallowed gambling losses.

We conclude that petitioner substantiated the amount of disallowed gambling deductions in issue (i.e., in excess of the amount respondent conceded--see <u>supra</u> pp. 16-17). Accordingly, we do not sustain respondent's disallowance of the gambling loss deductions Mr. Gagliardi claimed for 1999, 2000, and 2001. See also <u>Jackson v. Commissioner</u>, T.C. Memo. 2007-373 ("At trial, respondent conceded that petitioner had presented sufficient documentation to substantiate $127,165 in gambling losses"; "This documentation consisted of casino ATM receipts, canceled checks made payable to casinos, carbon copies of checks made payable to casinos, and credit card statements stating that cash was advanced at the casinos."). But see, e.g., <u>Hardwick v. Commissioner</u>, T.C. Memo. 2007-359 (distinguishable from the case at bar because gambling losses disallowed because evidence was inadequate to substantiate the claimed losses); <u>Lutz v. Commissioner</u>, T.C. Memo. 2002-89 (same).

II.  Addition to Tax and Penalty

Petitioner conceded underreporting certain amounts of gambling income for 1999, 2000, 2001.  See supra p. 16; see also Petzoldt v. Commissioner, 92 T.C. at 683; Money v. Commissioner, 89 T.C. at 48.  Even though we "upheld" the gambling loss deductions Mr. Gagliardi claimed for 1999, 2000, and 2001--i.e., did not sustain respondent's disallowance of the loss deductions and concluded that petitioner substantiated the amounts of the loss deductions respondent disallowed, on account of this additional unreported income we must decide whether petitioner is liable for additions to tax pursuant to section 6651(a)(1) for 2000 and 2001 and whether petitioner is liable for penalties pursuant to section 6662(a) for 1999, 2000, and 2001.

A.  Burden of Production:  Section 7491(c)

Section 7491(c) provides that the Commissioner will bear the burden of production with respect to the liability of any individual for additions to tax and penalties.  "The Commissioner's burden of production under section 7491(c) is to produce evidence that it is appropriate to impose the relevant penalty, addition to tax, or additional amount".  Swain v. Commissioner, 118 T.C. 358, 363 (2002); see also Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  The Commissioner, however, does not have the obligation to introduce evidence

regarding reasonable cause or substantial authority.  Higbee v. Commissioner, supra at 446-447.

B.  Section 6651(a)(1)

Respondent asserts that petitioner is liable for the addition to tax pursuant to section 6651(a)(1) for 2000 and 2001. Section 6651(a)(1) imposes an addition to tax for failure to file a return on the date prescribed (determined with regard to any extension of time for filing), unless such failure is due to reasonable cause and not due to willful neglect.  Section 6651(a)(1) imposes a charge, for each month or fraction thereof that a return is late, equal to 5 percent of the amount of tax that should have been shown on the return, subject to a maximum charge of 25 percent.  The taxpayer must show that he/she exercised business care and prudence but nevertheless was unable to file the return within the specified time.  See United States v. Boyle, 469 U.S. 241, 245 (1985); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  Willful neglect means a conscious, intentional failure, or reckless indifference.  United States v. Boyle, supra at 245.  Generally, factors that constitute "reasonable cause" include unavoidable postal delays, death or serious illness of the taxpayer or a member of his immediate family, or reliance on the mistaken legal opinion of a competent tax adviser, lawyer, or accountant that it was not necessary to

file a return.  McMahan v. Commissioner, 114 F.3d 366, 369 (2d Cir. 1997), affg. T.C. Memo. 1995-547.

Petitioner admitted that he did not timely file his tax returns for 2000 and 2001.  Accordingly, respondent has met his burden of production for the section 6651(a)(1) addition to tax for 2000.  Respondent, however, bears the burden of proof for the section 6651(a)(1) addition to tax for 2001 as he raised this issue for the first time in the answer.  See Rule 142(a)(1); Sanderling, Inc. v. Commissioner, 66 T.C. 743, 756-760 (1976), affd. in part and revd. in part on other grounds 571 F.2d 174 (3d Cir. 1978); Snyder v. Commissioner, T.C. Memo. 2006-92; Paleveda v. Commissioner, T.C. Memo. 1997-416, affd. without published opinion 178 F.3d 1303 (11th Cir. 1999).  Our resolution of this issue, however, does not depend on who bears the burden of proof. See Snyder v. Commissioner, supra; see also Bhattacharyya v. Commissioner, T.C. Memo. 2007-19 n.19.

Petitioner admitted that he did not timely file his returns for 2000 and 2001.  Petitioner timely filed his returns for the immediately previous years (1998 and 1999).  Petitioner knew his returns for 2000 and 2001 were due on April 15 of the following years.  Petitioner did not exercise business care and prudence in not timely filing his returns for 2000 and 2001.  See United States v. Boyle, supra at 245.  Accordingly, petitioner is liable for the section 6651(a)(1) addition to tax for 2000 and 2001.

C.  Section 6662

Respondent argues that petitioner is liable for the section 6662 penalty for 1999, 2000, and 2001.  Pursuant to section 6662(a), a taxpayer may be liable for a penalty of 20 percent on the portion of an underpayment of tax due to negligence or disregard of rules or regulations or a substantial understatement of income tax.  Sec. 6662(b).  An "understatement" is the difference between the amount of tax required to be shown on the return and the amount of tax actually shown on the return.  Sec. 6662(d)(2)(A).  A "substantial understatement" exists if the understatement exceeds the greater of (1) 10 percent of the tax required to be shown on the return for a taxable year or (2) $5,000.  See sec. 6662(d)(1)(A).

The accuracy-related penalty is not imposed with respect to any portion of the underpayment as to which the taxpayer acted with reasonable cause and in good faith.  Sec. 6664(c)(1).  The decision as to whether the taxpayer acted with reasonable cause and in good faith depends upon all the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  Relevant factors include the taxpayer's efforts to assess his proper tax liability, including the taxpayer's reasonable and good faith reliance on the advice of a professional.  See id.

Regardless of whether respondent satisfied his burden of production,[27] the record establishes that petitioner reasonably and in good faith relied on his return preparer.  Petitioner fully disclosed the facts and provided documents supporting his gambling income (and losses) to his return preparer.  Consequently, we conclude that petitioner had reasonable cause and acted in good faith as to any underpayment for 1999, 2000, and 2001.  Accordingly, we hold that petitioner is not liable for the penalty pursuant to section 6662(a).

III.  Conclusion

In reaching all of our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit. On account of the parties' concessions at trial and on brief, Rule 155 computations will be necessary.

---

[27]  Pursuant to the parties' concessions, our findings, and our conclusions, it is unclear at this time whether there is a substantial understatement.

We note that respondent bears the burden of proof for the increased amount of the sec. 6662 penalty for 2000 that he raised for the first time in the answer.  See Rule 142(a)(1); Sanderling, Inc. v. Commissioner, 66 T.C. 743, 756-760 (1976), affd. in part and revd. in part on other grounds 571 F.2d 174 (3d Cir. 1978); Snyder v. Commissioner, T.C. Memo. 2006-92; Paleveda v. Commissioner, T.C. Memo. 1997-416, affd. without published opinion 178 F.3d 1303 (11th Cir. 1999).  Our resolution of this issue, however, does not depend on who bears the burden of proof. See Snyder v. Commissioner, supra.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.